## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| DRF LOGISTICS, LLC, *et al.*, | § | Case No. 24-90447 (CML) |
| | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | **(Emergency Hearing Requested)** |

## EMERGENCY MOTION OF DEBTORS
## FOR INTERIM AND FINAL ORDERS
## (I) AUTHORIZING DEBTORS TO
## (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH
## COLLATERAL, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING AUTOMATIC STAY,
## (IV) SCHEDULING FINAL HEARING, AND (V) GRANTING RELATED RELIEF

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:00 P.M. (CENTRAL TIME) ON AUGUST 9, 2024.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 9, 2024 AT 1:00 P.M. (CENTRAL TIME).**

**PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ."**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  DRF Logistics, LLC (6861) and DRF, LLC (7236).  The Debtors' mailing address is 7171 Southwest Parkway, Bldg. 300, Suite 400, Austin, TX 78735.

> **CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

DRF Logistics, LLC and DRF, LLC in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1.      The Debtors commenced these chapter 11 cases (the "**Chapter 11 Cases**") to implement a consensual, orderly wind down of their businesses memorialized in the RSA and Plan (each as defined below).  In connection with negotiating the RSA, the Debtors and Pitney Bowes Inc. ("**PBI**" and together with its affiliates (as defined in the Bankruptcy Code), including Pitney Bowes International Holdings, Inc. ("**PBIH**"), "**Pitney Bowes**") reached an agreement on the terms of a DIP Financing, which will provide the Debtors with funds necessary to finance the Chapter 11 Cases.  In particular, the DIP Financing will allow the Debtors to preserve continuity and operation of their businesses, pay employees, fund administrative expenses, and satisfy working capital and operational needs, each of which is necessary to preserve value of the Debtors' assets during the orderly wind-down of Debtors' business in the Chapter 11 Cases.

2.      The DIP Financing is the product of extensive and arm's-length negotiations between the Debtors—under the supervision and direction of Debtor DRF Logistics, LLC's independent board of managers—and Pitney Bowes.  In connection with the Debtors' efforts to obtain postpetition financing, the Debtors, through their proposed financial advisor, Portage Point Partners ("**Portage Point**"), solicited offers for DIP Financing from seven potential

capital providers in addition to Pitney Bowes.  Notwithstanding such outreach, only one offer for DIP Financing was received—the offer received from Pitney Bowes.

3.      The Debtors, with the assistance of their advisors, determined that the DIP Financing described herein was the best (indeed, the only) financing option available.  In addition to being the only available financing, the DIP Financing is being provided as part of a broader agreement with Pitney Bowes, as reflected in the RSA and other documents embodied therein, while providing the Debtors with sufficient capital to fund the Chapter 11 Cases.

4.      As discussed in the Chiu Declaration (as defined below), the Debtors require incremental liquidity to finance the Chapter 11 Cases and ensure an orderly wind-down. Access to the proceeds of the DIP Financing will provide the Debtors with this much-needed liquidity and ensure they are adequately capitalized during the Chapter 11 Cases.  Access to the DIP Financing will also minimize disruption to the Debtors' operations by assuring creditors and other stakeholders that the Debtors have the financial wherewithal to implement the orderly wind-down of their businesses during the pendency of the Chapter 11 Cases.  The liquidity to be provided to the Debtors under the DIP Financing will, therefore, preserve the value of the Debtors' estates for the benefit of all stakeholders in the Chapter 11 Cases.  Accordingly, the DIP Financing is in the best interests of the Debtors and their estates and should be approved.

5.      Additional information regarding the DIP Financing, including the process through which the Debtors solicited interest in providing financing and negotiated the terms of the DIP Financing, is set forth in the *Declaration of Lisa Lansio in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying Automatic Stay, (IV) Scheduling Final Hearing,*

*and (V) Granting Related Relief* (the "**Lansio Declaration**") and the *Declaration of Robin Chiu in Support of First Day Motions and Applications* (the "**Chiu Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## Background

6.      On August 8, 2024 (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

7.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

8.      On August 8, 2024, the Debtors, Pitney Bowes International Holdings, Inc. ("**PBIH**"), Pitney Bowes, Inc. ("**PBI**" and together with its affiliates (as defined in the Bankruptcy Code) "**Pitney Bowes**"), and OPPS XI PTBW Holdings, L.P. and OPPS XII PTBW Holdings, L.P. ("**Oaktree**"), entered into that certain *Restructuring Support Agreement* (as may be amended, supplemented, or otherwise modified from time to time and including all exhibits thereto, the "**RSA**").  Under the RSA, PBI, PBIH, and Oaktree have agreed, subject to the terms and conditions of the RSA, to vote in favor of and support confirmation of the *Debtors' Joint Chapter 11 Plan of Liquidation* (the "**Plan**"), filed contemporaneously herewith.

9.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Eric Kaup in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, sworn to on the date hereof, and the Chiu Declaration, sworn to on the date hereof (together, the "**First Day Declarations**"), which have been filed contemporaneously herewith and incorporated herein by reference.[2]

## Jurisdiction

10.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

11.      By this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, 506 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1, the Debtors request that the Court:

(i)      authorize DRF Logistics, LLC (in such capacity, the "**Borrower**") to obtain postpetition financing (the "**DIP Financing**") pursuant to a senior secured, superpriority debtor-in-possession multi-draw term promissory note, consisting of term loans in an aggregate principal amount of up to $47 million (the commitments in respect thereof, the "**DIP Commitments**" and such loans, the "**DIP Loans**") from the DIP Lender (as defined below) of which $45 million will be available immediately upon entry of the Interim Order (the "**Initial Draw**"), with the remainder to be available subject to and upon entry of the Final Order, in each case subject to the terms and conditions set forth in that certain Debtor In Possession Secured Multi-Draw Term Promissory Note, attached hereto in substantially final form as **<u>Exhibit 1</u>** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Note**"), by and among the Borrower, DRF, LLC, as guarantor ("**Guarantor**" and together with the Borrower, "**Credit Parties**"), and Pitney Bowes International Holdings, Inc. (the "**DIP Lender**");

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declarations.

(ii)    authorize the Credit Parties to execute, deliver and perform their obligations under the DIP Note and all other loan or security documentation related to the DIP Loans, including, as applicable, security agreements, pledge agreements, account control agreements, mortgages, deeds, and such other documents that may be necessary or reasonably required to implement the DIP Loans in accordance with the DIP Note and/or that may be reasonably requested by the DIP Lender in connection with the DIP Loans, in each case, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Note, the Interim Order, and, upon entry thereof, the Final Order, the "**DIP Documents**");

(iii)    authorize the Credit Parties to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, interest, fees and premiums, costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(iv)    subject and subordinate to the Carve-Out (as defined below), grant to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(v)    subject and subordinate to the Carve-Out, grant to the DIP Lender valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on all DIP Collateral (as defined herein), on the terms described herein, including, subject only to and effective upon entry of the Final Order, the proceeds of any avoidance actions, which security interests and liens shall be subject to the priorities set forth herein; provided, however, that the DIP Lender shall use commercially reasonable efforts to first obtain recoveries from DIP Collateral other than the proceeds of avoidance actions;

(vi)    authorize the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of the Interim Order;

(vii)    subject to entry of the Final Order granting such relief, waive the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(viii)    subject to entry of the Final Order granting such relief, waive the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral for the benefit of any party other than the DIP Lender;

(ix)    authorize the Debtors to use proceeds of the DIP Loans and Cash Collateral solely in accordance with the Interim Order and the DIP Documents;

(x)    authorize the Debtors to pay the principal, interest, fees, expenses, reimbursements, and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xi)  vacate and modify the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**") to the extent necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the Interim Order, the DIP Documents and, upon entry, the Final Order, to deliver any notices of default or termination described below and as further set forth herein;

(xii)  waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order; and

(xiii)  scheduling a final hearing (the "**Final Hearing**") to consider final approval of the DIP Financing and use of Cash Collateral pursuant to a proposed final order  (the "**Final Order**"), as set forth in this Motion and the DIP Documents filed with this Court.

12.    A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Interim Order**").  Prior to a final hearing on the relief requested herein, the Debtors will file a proposed Final Order (and together with the Interim Order, the "**Orders**").

<u>**Summary of Terms of DIP Financing**</u>

13.    In accordance with Bankruptcy Rules 4001(b)–(d) and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "**Complex Case Procedures**"), as incorporated Bankruptcy Local Rule 1075, the below chart summarizes the significant terms of the Interim Order and the DIP Note.[3]

| MATERIAL TERMS | | Location |
|---|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | DRF Logistics, LLC | DIP Note, Preamble |
| **Guarantor**<br>Bankruptcy Rule 4001(c)(1)(B) | DRF, LLC | DIP Note, Preamble |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Pitney Bowes International Holdings, Inc. | DIP Note, Preamble |

---

[3]    The following summary of the terms of the DIP Financing is subject entirely to the express terms of the DIP Note. If there are any inconsistencies between the summary below and the DIP Note, then the DIP Note shall control.

| MATERIAL TERMS | | Location |
|---|---|---|
| **DIP Financing and Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Lender agrees to provide senior secured, superpriority DIP Loans to Borrower from time to time pursuant to a multi-draw debtor-in-possession term promissory note, in an aggregate principal amount of up to $47 million. | DIP Note, § 1(a) |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | Use of proceeds of the DIP Loans shall be subject to an initial agreed budget, which shall be in form and substance acceptable to, and subject to written approval of, the DIP Lender (the "**Approved Budget**"), consisting of forecasted receipts and disbursements of the Borrower on a consolidated basis for the 13 weeks commencing on the Petition Date.<br><br>Beginning on September 5, 2024, and every fourth Thursday thereafter, the Borrower shall deliver to the DIP Lender a revised proposed budget, which shall be in form and substance acceptable to, and subject to written approval of, the DIP Lender.  Upon written approval of such revised proposed budget by the DIP Lender, in its sole discretion, such proposed budget shall modify, replace, supplement, or supersede, as applicable, all prior budgets for the periods covered thereby and become the Approved Budget. | DIP Note, § 1(e), 14(h) |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | Subject to the terms of the DIP Note, the DIP Loans or any portion thereof shall bear interest on the principal amount thereof from time to time outstanding, from the date of the DIP Loans until repaid, at a rate per annum equal to 10.00%, which shall be payable in kind. | DIP Note, § 4(a) |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors shall pay the DIP Lender:<br><br>• an upfront fee of 2.00% of the DIP Commitment, which shall be fully earned and non-refundable upon entry of an interim DIP order, and payable in kind; and<br><br>• a fee of 1.00% of the unused DIP Commitment during the preceding month, shall accrue and payable in kind. | DIP Note, § 4(d), 8(b) |
| **Maturity Date; Duration for Use of DIP Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Maturity Date</u>:  November 29, 2024 (as may be extended by mutual agreement between the Borrower and DIP Lender) | DIP Note, § 3 |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Optional Prepayments</u>:  Subject to the terms and conditions of the Orders the Borrower shall have the right at any time and from time to time to prepay the DIP Loans under the DIP Note in whole or in part (without premium or penalty) upon two (2) Business Days' written notice to the DIP Lender by 1:00 p.m. New York City time (or such shorter time as the DIP Lender may agree); provided that each such prepayment shall be in a minimum amount of $100,000. Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate original principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds or the consummation of certain transactions which are not received or consummated. Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the DIP Note being prepaid or repaid to the date of prepayment or repayment. Any prepayment made shall be | DIP Note, § 6, 7(a)-(e). |

| MATERIAL TERMS | Location |
|---|---|
| | applied (a) first to the DIP Loans until paid in full and (b) second, to any remaining DIP Obligations as the DIP Lender shall determine in its sole discretion.<br><br>Mandatory Prepayments:  In each case, subject to the terms and conditions of the Orders and the Approved Budget, upon not less than one (1) Business Day prior written notice by the Borrower to the DIP Lender by 1:00 p.m. New York City time:<br><br><ul><li>No later than two (2) Business Days upon receipt by any Credit Party of cash proceeds of any debt securities or other indebtedness not permitted under the DIP Note, the Borrower shall prepay the outstanding principal amount of the DIP Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.</li><li>Commencing on October 18, 2024, the Borrower shall prepay the DIP Loans within 4 Business Days' of such date if the Borrower's cash on hand as of such date exceeded the amount of remaining disbursements set forth in the Approved Budget plus $5,000,000.</li><li>Prepayments shall be applied (i) first to the DIP Loans until paid in full, (ii) second, to any remaining DIP Obligations as the DIP Lender shall determine in its sole discretion and (iii) third, any excess remaining to the Borrower.</li><li>DIP Lender may elect prior to any required prepayment required to decline all or any portion of the prepayment.</li></ul> | |
| **Conditions to Closing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary for financings of this type, including, among other things:<br><ul><li>the Petition Date shall have occurred;</li><li>the Court shall have entered the Interim Order, which shall not have been vacated, reversed, modified, amended, or stayed; and</li><li>delivery of the Initial Budget (as defined in the DIP Note), attached hereto as <u>Exhibit B</u>.</li></ul> | DIP Note, § 2 |
| **Superpriority Expense Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i) | Subject to the Carve-Out, the DIP Lender is granted, pursuant to Bankruptcy Code sections 364(c)(1), 503, and 507, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases for all DIP Obligations. | Interim Order, ¶ 8 |
| **Collateral and Priority**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject and subordinate to the Carve-Out and the Permitted Liens (as defined below), if any, to secure the DIP Obligations, the DIP Lender is granted, without the necessity of the execution, recordation or filing by the Borrower of any mortgages, security agreements, account control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Lender of, or over, any collateral, the following | Interim Order, ¶ 7 |

security interests and liens (all such security interests and liens granted to the DIP Lender pursuant to the Orders and the DIP Documents, the "**DIP Liens**" and the property subject to the DIP Liens, the "**DIP Collateral**"):

(a) *Section 364(c)(2) DIP Liens.* Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, and automatically and fully-perfected first priority senior security interest (subject and subordinate only to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of each of the Credit Parties and their estates, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including any unencumbered cash of the Debtors and any investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, investment property, letter-of-credit rights, supporting obligations, vehicles, plants, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of Debtor DRF, LLC and a portion of the issued and outstanding capital stock of non-Debtor Pitney Bowes Global Ecommerce (APAC) Co. Ltd. (as set forth in the DIP Documents), beneficial interests in any trust, money, goodwill, causes of action, including, upon entry of the Final Order, the proceeds of avoidance actions, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired or arising and wherever located; provided, however, that the DIP Lender shall use commercially reasonable efforts to first obtain recoveries from DIP Collateral other than the proceeds of avoidance actions.

(b) *Section 364(c)(3) DIP Liens.* Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest (subject and subordinate to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of each of the Credit Parties, whether existing on the Petition Date or thereafter acquired, and all cash and non-cash proceeds, rents, products, substitutes, accruals and profits of such property that is subject to liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code) (collectively, the "**Permitted Liens**"), which security interests and liens in favor of the DIP Lender shall be immediately junior and subordinate to any such Permitted Liens; *provided* that DIP Liens shall be senior to liens granted pursuant to that certain *Secured Senior Takeback Note* (as may

| MATERIAL TERMS | | Location |
|---|---|---|
| | be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), between the Debtors and Oaktree.<br><br>(c) *Excluded Assets.* Notwithstanding the foregoing, the liens granted shall not attach to any Excluded Property, and no Excluded Property shall constitute DIP Collateral. | |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary affirmative covenants for financings of this type, including stipulations to, among other things:<br>• permit the DIP Lender to audit all corporate and financial books and records of the Debtors;<br>• maintain insurance with respect to the DIP Collateral; and<br>• preserve and maintain their legal existence<br>Usual and customary negative covenants for financings of this type, including stipulations to, among other things, not:<br>• create, incur, assume, or otherwise become or remain liable with respect to any indebtedness except as permitted;<br>• create, incur, assume, or permit existence of any liens on any property or assets, except as permitted;<br>• pay or make certain restricted payments, except as permitted;<br>• enter into or cause to exist certain burdensome agreements;<br>• make or own any investment, except as permitted; and<br>• make any disposition of assets, except as permitted. | DIP Note, § 14, 15 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | Usual and customary events of default for financings of this type, subject to customary grace periods and thresholds, including:<br>• any missed Milestones (as defined herein);<br>• failure to comply with the RSA;<br>• failure to comply with the Shared Services Agreement entered into between the Debtors and DIP Lender, dated August 8, 2024 (the "**SSA**");<br>• entry of an order by the Bankruptcy Court conferring standing of a creditors' committee or any to pursue claims and causes of action on behalf of the Debtors or their estates against the DIP Lender or any of its affiliates (as defined in the Bankruptcy Code);<br>• the filing of any chapter 11 plan that is not an Approved Plan (as defined in the RSA);<br>• entry of an order by the Bankruptcy Court terminating the Debtors' exclusive periods to file a chapter 11 plan and solicit acceptances thereof; and<br>• entry of an order by the Bankruptcy Court denying confirmation of an Approved Plan. | DIP Note, § 15 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | The DIP Note contains the following milestones (collectively, the "**Milestones**"):<br>• No later than the date that is 2 business days after the Petition Date, the Bankruptcy Court shall have entered an interim | DIP Note, Annex B |

| MATERIAL TERMS | Location |
|---|---|

| | MATERIAL TERMS | Location |
|---|---|---|
| | DIP order, in form and substance acceptable to the DIP Lender; | |
| | • No later than the date that is 7 calendar days after the Petition Date, the Debtors shall have filed the Approved Plan and a disclosure statement (the "**Disclosure Statement**"), in form and substance acceptable to the DIP Lender; | |
| | • No later than 14 calendar days after the Petition Date, the Debtors shall have filed a motion (the "**SSA Motion**"), in form and substance acceptable to the DIP Lender, seeking approval of the SSA; | |
| | • No later than 45 calendar days after the Petition Date, the Bankruptcy Court shall have entered the final DIP order, in form and substance acceptable to the DIP Lender; | |
| | • No later than the date that is the earlier of (a) 45 calendar days after the Petition Date and (b) 30 calendar days after the appointment of a statutory committee of unsecured creditors (if any), the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, approving the SSA Motion; | |
| | • No later than the date that is 50 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, setting forth the claims bar date; | |
| | • No later than the date that is 60 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Disclosure Statement and authorizing the Debtors to solicit the Approved Plan; | |
| | • No later than November 15, 2024, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, approving and confirming the Approved Plan; *provided* that this Milestone shall be automatically extended by the same number of days of any extension of the Maturity Date mutually agreed to by the Borrower and DIP Lender; and | |
| | • No later than November 29, 2024, the effective date of the Approved Plan shall have occurred; *provided,* that this Milestone shall be automatically extended by the same number of days of any extension of the Maturity Date mutually agreed to by the Borrower and DIP Lender. | |
| **Carve-Out**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | "**Carve-Out**" means the sum of:<br><br>(i) All unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of | Interim Order, ¶ 12(b) |

| MATERIAL TERMS | Location |
|---|---|
| | the United States Code plus interest at the statutory rate, pursuant to 31 U.S.C. § 3717; | |
| | (ii)  All unpaid reasonable and documented fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; | |
| | (iii)  To the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise, all accrued but unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained or proposed to be retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code, at any time before or on the first Business Day following the delivery of the Carve-Out Trigger Notice (as defined in the Interim Order) and without regard to whether such fees or expenses are provided for in any Approved Budget or were invoiced after the Carve-Out Trigger Date and any monthly, restructuring, sale, success or other transaction fee payable to Debtor Professionals, whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice; | |
| | (iv)  Allowed Professional Fees of Debtor Professionals incurred after the first Business Day following the Carve-Out Trigger Date in an aggregate amount not to exceed $2,500,000; and | |
| | (v)  Allowed Professional Fees of the Committee incurred after the first Business Day following the Carve-Out Trigger Date in an aggregate amount not to exceed $250,000. | |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | Use of DIP Proceeds and Cash Collateral: The Borrower shall utilize the proceeds of DIP Loans, subject to the Interim Order, to i. fund general corporate needs, including without limitation working capital and other needs and ii. pay costs, premiums, fees, and expenses incurred to administer or related to of the Chapter 11 Cases, including fees and expenses of professionals, in each case, solely in accordance with the Approved Budget, subject to any Permitted Variance, as defined in the DIP Note).<br><br>Limitations on Use of DIP Proceeds and Cash Collateral: Unless otherwise provided in the Approved Budget, subject to any Permitted Variance or approved by the DIP Lender, no portion of any DIP Loans shall be used, directly or indirectly: (A) except as permitted by section 15(d) of the DIP Note, to make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Interim Order or Final Order or to finance or make any restricted payment, (B) to pay any fees or similar amounts payable to any person who has proposed or may propose to purchase interests in any of the Borrower or any of its respective subsidiaries or affiliates or who otherwise has proposed or may propose to invest in the Borrower or any of its respective Subsidiaries or affiliates (including so-called "topping fees," "exit fees," and similar amounts), or (C) to make any distribution under a plan of | DIP Note, § 1(e) |

| MATERIAL TERMS | | Location |
|---|---|---|
| | reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the Borrower. | |
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | DIP Lender and Oaktree | Interim Order, ¶ M |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv) | Oaktree has consented to the Debtors use of cash collateral and is waiving any request for adequate protection to which it is entitled under the Bankruptcy Code. | Interim Order, ¶ 4 |
| **Determination Regarding Prepetition Claims**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order does not contain stipulations of fact by the Debtors related to the validity and enforceability of the Debtors' prepetition secured obligations. | N/A |
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi) | Subject to entry of the Final Order, the DIP Lender will receive a lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code; provided, however, that the DIP Lender shall use commercially reasonable efforts to first obtain recoveries from DIP Collateral other than the proceeds of avoidance actions. | Interim Order, ¶ 7 |
| **Effect of Debtors' Stipulations on Third Parties**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iii), (viii) | N/A | N/A |
| **Waiver or Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Pursuant to the Interim Order, the Automatic Stay provisions of section 362 of the Bankruptcy Code are modified to the extent necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the Interim Order, the DIP Documents and, upon entry, the Final Order, to deliver any notices of default or termination described below and as further set forth herein.<br><br>Moreover, pursuant to the Interim Order, upon the occurrence and during the continuation of a DIP Note Event of Default that has not been waived by the DIP Lender or otherwise cured in accordance with the DIP Documents (an "**Event of Default Occurrence**"), and following delivery of a written notice (a "**Default Notice**") on not less than five business days' notice (such five business day period, the "**Remedies Notice Period**") by the DIP Lender to counsel to the Debtors, counsel to the Creditors' Committee or other statutory committee (if any), and the U.S. Trustee (the "**Remedies Notice Parties**"), the DIP Lender may (and the Automatic Stay is hereby modified, except as otherwise set forth herein) without further notice to, hearing of, or order from this Court, unless this Court orders | Interim Order, ¶ 10(b), 13(a), 13(b), 13(c) |

otherwise (*provided, that*, during the Remedies Notice Period, the Debtors, the Creditors' Committee or other statutory committee (if any), and/or any party in interest shall be entitled to seek an emergency hearing before the Court, and must provide prompt notice of such hearing to counsel to the DIP Lender, to contest whether an Event of Default Occurrence has occurred and/or to seek authority for the non-consensual use of Cash Collateral, and *provided, further,* that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period shall be continued until the Court hears and rules with respect thereto): (i) terminate any and all obligations of the DIP Lender in connection with the DIP Loans (including to make any further DIP Loans (except with respect to the funding of the Carve-Out in accordance with the Interim Order)) and the authority for the use of Cash Collateral under the Interim Order and the DIP Documents, as applicable; (ii) declare the DIP Obligations (subject only to the Carve-Out) immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Borrower; (iii) terminate or reduce the DIP Commitments to the extent any such commitments remain outstanding; (iv) terminate the DIP Note and the DIP Loans thereunder with respect to any future liability or obligation of the DIP Lender, but, for the avoidance of doubt, without affecting any of the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations and any rights of the DIP Lender provided by the Interim Order; (v) invoke the right to charge interest at the default rate under the DIP Documents; and (vi) deliver the Carve-Out Trigger Notice; *provided, that*, notwithstanding delivery of a Default Notice, the Debtors may use the proceeds of the DIP Loans (only to the extent already drawn prior to the occurrence of a DIP Note Event of Default that is continuing or for the funding of the Carve-Out in accordance with the Interim Order), and other DIP Collateral in accordance with the terms of the Interim Order (including in respect of borrowing under the DIP Note to fund the Carve-Out in accordance with the Interim Order) and the Approved Budget (including any Permitted Variance).

Upon an Event of Default Occurrence, the DIP Lender, prior to exercising any rights or remedies with respect to the DIP Collateral, shall be required to file a motion with the Court seeking emergency relief and an emergency hearing before the Court (a "**Stay Relief Hearing**") on at least five business days' written notice to the Remedies Notice Parties, and the Debtors agree not to object to the shortening of notice of such Stay Relief Hearing.  At such Stay Relief Hearing, the DIP Lender may seek Court approval to enforce any other rights or remedies (in addition to those set forth in paragraph 13(a) above) with respect to the DIP Collateral and the DIP Liens, including (i) the enforcement of DIP Liens, including foreclosure on all or any portion of the DIP Collateral, occupying the Debtors' premises, or sale or disposition of all or any part of the DIP Collateral, or (ii) any other remedies permitted under the Interim Order, the DIP Documents, or applicable law.  If the DIP Lender is permitted by the Court to take any enforcement action with respect to the DIP Collateral following the Stay Relief Hearing, the Debtors shall cooperate with the DIP Lender in its effort to enforce its security interest in and liens on the DIP Collateral, and shall not take or direct

| MATERIAL TERMS | | Location |
|---|---|---|
| | any person or entity to take any action designed or intended to hinder or restrict in any respect the DIP Lender from enforcing its security interests and liens on the DIP Collateral. For the avoidance of doubt, prior to the entry by this Court of an order granting stay relief to the DIP Lender, the Debtors may use the proceeds of the DIP Loans (to the extent already drawn prior to the occurrence of a DIP Note Event of Default that is continuing) or Cash Collateral in accordance with the Approved Budget (including Permitted Variances) and the terms of the DIP Documents and the Interim Order, as applicable.<br><br>Notwithstanding the occurrence of a DIP Note Event of Default and/or termination of the DIP Commitments, all of the rights, remedies, benefits, and protections provided to the DIP Lender under the DIP Documents and the Interim Order shall survive. For the avoidance of doubt, irrespective of any Remedies Notice Period, the DIP Lender shall not be obligated to provide any DIP Loans or advances at any time upon the occurrence and continuation of a DIP Note Event of Default]. | |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit**<br>Bankruptcy Rule 4001(c)(1)(B)(v) | The Interim Order does not provide for a waiver of any entity's authority or right to file a plan, request the use of cash collateral, or request authority to obtain credit. | N/A |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order does not provide for a waiver of non-bankruptcy law relating to the perfection or enforcement of a lien. | N/A |
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the provisions of paragraph 20 of the Interim Order, except in the case of fraud, gross negligence, or willful misconduct, in each case, as judicially determined by a final order from a court of competent jurisdiction, each of the Debtors and their estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Lender and (a) each of its respective non-Debtor subsidiaries and non-Debtor affiliates (as defined in the Bankruptcy Code), and (b) each of officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof of the DIP Lender and each of its non-Debtor subsidiaries and non- | Interim Order, ¶ 20 |

| MATERIAL TERMS | | Location |
|---|---|---|
| | Debtor affiliates, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives" and, together with the DIP Lender, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case solely arising out of or related to (as applicable) the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors or their estates at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Interim Order. For the avoidance of doubt, nothing in this release shall relieve the DIP Lender or the Debtors or their respective obligations under the DIP Documents and the Interim Order. | |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Note and Interim Order contain indemnification provisions ordinary and customary for debtor-in-possession financings of this type. | DIP Note, § 9<br>Interim Order, ¶ 26 |
| **Section 506(c) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Except to the extent of the Carve-Out and subject to entry of a Final Order granting such relief, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, and nothing contained in the Interim Order shall be deemed to be a consent by the DIP Lender to any charge, lien, assessment, or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise. | Interim Order ¶ 22 |
| **Section 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B) | Subject to entry of a Final Order granting such relief, no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations. | Interim Order ¶ 23 |

**Statement Regarding Significant Provisions**

14. Pursuant to paragraph 8 of the Complex Case Procedures, the DIP Note and/or the Orders contain the following provisions ("**Significant Provisions**"):

| DIP Financing Term | Relief Requested |
|---|---|
| **Plan Confirmation Milestones** <br> Complex Case Procedures ¶ 8(a) | The DIP Note, attached hereto as **Exhibit C**, requires the Debtors to comply with the following Milestones including: <br><br> • No later than the date that is 2 business days after the Petition Date, the Bankruptcy Court shall have entered an interim DIP order, in form and substance acceptable to the DIP Lender; <br><br> • No later than the date that is 7 calendar days after the Petition Date, the Debtors shall have filed the Approved Plan and a DS, in form and substance acceptable to the DIP Lender; <br><br> • No later than 14 calendar days after the Petition Date, the Debtors shall have filed the SSA Motion in form and substance acceptable to the DIP Lender, seeking approval of the SSA; <br><br> • No later than 45 calendar days after the Petition Date, the Bankruptcy Court shall have entered the final DIP order, in form and substance acceptable to the DIP Lender; <br><br> • No later than the date that is the earlier of (a) 45 calendar days after the Petition Date and (b) 30 calendar days after the appointment of a statutory committee of unsecured creditors (if any), the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, approving the SSA Motion; <br><br> • No later than the date that is 50 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, setting forth the claims bar date; <br><br> • No later than the date that is 60 calendar days after the Petition Date, the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the DIP Lender, approving the Disclosure Statement and authorizing the Debtors to solicit the Approved Plan; <br><br> • No later than November 15, 2024, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Lender, approving and confirming the Approved Plan; *provided,* that this Milestone shall be automatically extended by the same number of days of any extension of the Maturity Date mutually agreed to by the Borrower and DIP Lender; and <br><br> • No later than November 29, 2024, the effective date of the Approved Plan shall have occurred; *provided,* that this Milestone shall be automatically extended by the same |

| DIP Financing Term | Relief Requested |
|---|---|
| | number of days of any extension of the Maturity Date mutually agreed to by the Borrower and DIP Lender.<br><br>Justification:  These milestones are appropriate given the amount of funding the DIP Lender are willing to make available to the Debtors to fund the Chapter 11 Cases.  The Debtors believe that the DIP Lender would not have otherwise provided the DIP Loans. |
| **Cross-Collateralization**<br>Complex Case<br>Procedures ¶ 8(b) | The Interim Order does not provide for cross-collateralization. |
| **Roll-ups**<br>Complex Case<br>Procedures ¶ 8(c) | The Interim Order does not provide for a roll-up. |
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions**<br>Complex Case<br>Procedures ¶ 8(d) | Subject to entry of the Final Order, the DIP Lenders will receive a lien on the proceeds of any avoidance actions; provided, however, that the DIP Lender shall use commercially reasonable efforts to first obtain recoveries from DIP Collateral other than the proceeds of avoidance actions.  Interim Order ¶ 7(a).<br><br>Justification:  Granting DIP Liens and DIP Superpriority Claims on proceeds and property recovered in respect of Avoidance Actions is appropriate because the DIP Facility provides the Debtors with necessary liquidity to fund the Debtors' Chapter 11 Cases and ensure the Debtors are able to maximize value for their estates. Moreover, the liens were required by the DIP Lender as a condition to extending credit. The Debtors respectfully submit that granting liens on the proceeds of avoidance actions is appropriate under these circumstances because it is subject to a final order and will allow parties in interest the opportunity to object. |
| **Default Provisions and Remedies**<br>Complex Case<br>Procedures ¶ 8(e) | The Interim Order and DIP Note provide for certain Events of Default and remedies upon Events of Default, including customary termination events for, among other things, any material default, violation, or breach of the terms of the Interim Order by the Debtors, conversion or dismissal of the Debtors' cases, or appointment of a chapter 11 trustee. Interim Order ¶¶ 13(a), 13(b).<br><br>Justification: These Events of Default appropriately balance, in the Debtors' view, the DIP Lender's need for protection and the Debtors' need for debtor-in-possession financing. In addition, the DIP Lender must provide five (5) business days' prior written notice prior to exercising its rights under the DIP Documents and file a motion seeking emergency relief from the automatic stay. Until such time as the stay relief motion has been adjudicated by the Court, the Debtors may use the proceeds of the DIP Loans (to the extent drawn prior to the occurrence of the Event of Default (as defined in the DIP Note) to fund operations in accordance with the DIP Note. Therefore, the Interim Order does ***not*** provide for the automatic lifting of the stay upon a DIP Note Event of Default. |
| **Releases of Claim Against Lender or Others** | Subject to the provisions of paragraph 20 of the Interim Order, except in the case of fraud, gross negligence, or willful misconduct, in each |

| DIP Financing Term | Relief Requested |
|---|---|
| Complex Case Procedures ¶ 8(f) | case, as judicially determined by a final order from a court of competent jurisdiction, each of the Debtors and their estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Lender and (a) each of its respective non-Debtor subsidiaries and non-Debtor affiliates (as defined in the Bankruptcy Code), and (b) each of officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof of the DIP Lender and each of its non-Debtor subsidiaries and non-Debtor affiliates, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives" and, together with the DIP Lender, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the Petition Date of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case solely arising out of or related to (as applicable) the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors or their estates at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Interim Order.  For the avoidance of doubt, nothing in this release shall relieve the DIP Lender or the Debtors or their estates of their respective obligations under the DIP Documents and the Interim Order.  Interim Order ¶ 20. |
| **Limitations on the Use of DIP Proceeds** Complex Case Procedures ¶ 8(g) | Unless otherwise provided in the Approved Budget, subject to any Permitted Variance or approved by the DIP Lender, no portion of any DIP Loans shall be used, directly or indirectly: (A) except as permitted by Section **Error! Reference source not found.**, to make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Interim Order or Final Order or to finance or make any restricted payment, (B) to pay any fees or similar amounts payable to any person who has proposed or may propose to purchase interests in any of the Borrower or any of its respective subsidiaries or affiliates or who otherwise has proposed or may propose to invest in the Borrower or any of its respective Subsidiaries or affiliates (including so-called "topping fees," "exit fees," and similar amounts), or (C) to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar |

| DIP Financing Term | Relief Requested |
|---|---|
| | proceeding of any of the Subsidiaries or affiliates of any of the Borrower.  *See* DIP Note § 1(e). |
| | Justification:  These limitations are usual and customary. The Debtors, having engaged in arm's length negotiations with the DIP Lenders, agreed to limit the Debtors' use of proceeds of the DIP Loans as consideration for, among other things, the provision of new money within the broader context the Debtors' value-maximizing chapter 11 process. The limitation is reasonable given the facts and circumstances of the Chapter 11 Cases. |
| **Priming Liens**<br>Complex Case Procedures ¶ 8(h) | Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest (subject and subordinate to the Carve-Out) in, and lien upon, all tangible and intangible prepetition and postpetition property of each of the Loan Parties, whether existing on the Petition Date or thereafter acquired, and all cash and non-cash proceeds, rents, products, substitutes, accruals and profits of such property that is subject to Permitted Liens, which security interests and liens in favor of the DIP Lender shall be immediately junior and subordinate to any such Permitted Liens; *provided* that DIP Liens shall be senior to liens granted pursuant to that certain *Secured Senior Takeback Note* (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof), between the Debtors and Oaktree.  Interim Order ¶ 7(b).<br><br>Justification:  It is appropriate to provide priming liens to the DIP Lenders to secure the DIP Obligations because Oaktree has consented to the priming of their liens.  The Interim Order does not provide for any non-consensual priming liens.  Furthermore, Oaktree has waived adequate protection. |

## Background

**A.      Need for DIP Financing**

15.      The Debtors require access to the DIP Financing to ensure they have sufficient liquidity to implement the orderly wind down of their businesses over the course of the Chapter 11 Cases.  The Debtors are entering chapter 11 with only approximately $2.2 million cash on hand, which is insufficient to fund operations and expenses for the projected duration of the Chapter 11 Cases, including costs associated with marketing and selling substantially all of the Debtors' assets, while the Debtors implement an orderly wind-down.

16.      As further described in the Kaup Declaration, the Debtors have incurred operating losses each year since 2017, rendering their business unprofitable and unsustainable.

The Debtors' operating losses are projected to further increase in light of headwinds which the Debtors' rely on for its forward parcel delivery service, and changes in the broader ecommerce market.  These forces collectively have put pressure on the Debtors, which sought chapter 11 relief to promote an orderly wind-down and liquidation process.  That process requires access to capital.

17.     The Debtors, with the assistance of Portage Point, undertook a detailed analysis of their operations and funding needs.  From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow them to implement an orderly wind down of their operations in the Chapter 11 Cases.  Specifically, the Debtors, in consultation with Portage Point, determined that DIP financing is necessary to, among other things, (i) promote the orderly wind down of their business, (ii) fund payroll, (iii) satisfy other working capital and operational needs, and (iv) pay administrative expenses and other costs associated with the chapter 11 process. In sum, access to DIP financing is critical to preserve the value of the Debtors' assets and to facilitate the orderly wind-down of the Debtors' operations contemplated by the RSA and the Plan.

18.     Based upon projections in the Initial DIP Budget, the Debtors and their advisors determined that, without access to the DIP Financing, the Debtors will not have sufficient cash to maintain limited business operations, pay employees, and fund the administration of the Chapter 11 Cases through the wind-down.  Without cash, the Debtors could not afford to run a robust marketing and sale process, with the assistance of qualified advisors.  This would disrupt the company at a critical time when preserving value is of utmost importance.

19.     Such a disruption in operations would almost certainly have a negative impact on the value of the Debtors' estates, which would cause the Debtors to suffer immediate and irreparable harm to the detriment of the Debtors' creditors.

**B.**     **Efforts to Obtain DIP Financing**

20.     In June 2024, Pitney Bowes approached the Debtors to propose the DIP Financing as part of the broader negotiations in connection with the Chapter 11 Cases. The Debtors and advisors began discussions with the Pitney Bowes regarding the proposed financing and engaged in a series of exchanges concerning the potential terms and conditions of such financing. Motivated to minimize further losses associated with the Debtors' continued operations, Pitney Bowes expressed a willingness to provide the DIP Financing on better-than-market terms to ensure the Debtors' orderly wind down in the Chapter 11 Cases.

21.     Indeed, as discussed in the Lansio Declaration, beginning in July 2024, with assistance from the Debtors' management team and advisors, Portage Point commenced a marketing process to determine whether an alternative source of debtor-in-possession financing existed in the market. Portage Point explored potential interest in debtor-in-possession financing from seven third-party lenders. None of these parties expressed an interest in providing such financing, much less on terms superior to the DIP Financing proposed by Pitney Bowes.

22.     In particular, the proposed DIP Note includes minimal fees, a market interest rate, and relatively modest covenants when compared with debtor-in-possession financing arrangements of similar size. Furthermore, pursuant to the RSA, Pitney Bowes has agreed to support the Debtors through the Chapter 11 Cases, including through the SSA (as defined in the RSA), which will allow the Debtors to continue using shared services with Pitney Bowes during the Chapter 11 Cases. This total package of transactions will facilitate the liquidation of assets and ultimate wind-down of the Debtors.

23.     In addition, as the Debtors' former corporate parent, PBIH is uniquely familiar with the Debtors' business and the circumstances of the Chapter 11 Cases, allowing the Debtors to bypass the time and expense of due diligence and additional professional fees incidental

to third-party debtor-in-possession financing.  Therefore, the proposed DIP Financing will provide the Debtors with access to immediate liquidity and avoids the execution risk and time constraints a third-party lender proposal would necessarily entail.

24.     Following an arm's-length negotiation over several weeks, the Debtors reached an agreement with the PBIH on the terms of financing in the aggregate principal amount of up to $47 million, comprised of the following:  (i) new-money term loans to be made in multiple draws following entry of the Interim Order in an aggregate principal amount equal to $45 million; and (ii) new-money term loans to be made in multiple draws following entry of the Final Order in an aggregate principal amount equal to $2 million.

25.     In addition, the following summarizes certain additional key terms of the DIP Financing, as further summarized above:

- *Interest Rate*: the DIP Financing will accrue interest at a rate of 10.00% per annum, accruing monthly and payable in kind;

- *Upfront Fee*: the Debtors have agreed to pay the DIP Lender a an upfront fee of 2.00% of the DIP Commitment, which shall be fully earned and non-refundable upon entry of an interim DIP order, and payable in kind; and

- *Undrawn Commitment Fee*: the Debtors have agreed to pay the DIP Lender a fee of 1.00% of the unused DIP Commitment during the preceding month, shall accrue and payable in kind.

**C.     Use of Cash Collateral**

26.     On August 8, 2024, prior to the commencement of the Chapter 11 Cases, the Debtors and Oaktree, entered into that certain *Secured Senior Takeback Note* (the "**Oaktree Takeback Note**"), pursuant to which the Debtors promised to the order of Payee the principal aggregate amount of $3.3 million, consisting of a (i) a first tranche of $2.4 million and (ii) a second tranche of $900,000.  The Oaktree Takeback Note is secured by a lien on substantially all of the Debtors' assets, including the Debtors' cash.

27.     Pursuant to the Oaktree Takeback Note and RSA, Oaktree has agreed to allow the Debtors to use any cash that constitutes Oaktree's cash collateral (as defined in section 363 of the Bankruptcy Code) during the Chapter 11 Cases.  Oaktree further has agreed not to seek adequate protection on account of its interest in any "Collateral" (as that term is defined in the Oaktree Takeback Note) securing the Debtors' obligations under the Oaktree Takeback Note. Accordingly, the Debtors seek authority to continue use of cash collateral on a consensual basis during the pendency of the Chapter 11 Cases.

### The DIP Financing Should Be Approved

28.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  As set forth in the Lansio Declaration, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.  *See* 11 U.S.C. §§ 364(a)–(b), 503(b)(1).  Having determined that postpetition financing was only available pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated with the PBIH to secure the DIP Financing on the terms described herein.  For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) for authority to enter into the DIP Financing.

### A.     DIP Financing Represents an Exercise of Debtors' Business Judgment

29.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their business judgment in obtaining such credit.  *See, e.g.*, *In re Estrada*, No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to

exercise their basis business judgment consistent with their fiduciary duties."); *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (Docket No. 21) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

30.    The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification and the decision furthers the interests of the Debtor and other parties in interest.  *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code); *see also Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).  Courts generally will not second-guess a debtor's business decisions when those decisions involve the appropriate level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interest of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  Further, in considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855–86 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Tr. Co. of Escanaba (In re Ellingsen*

*MacLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

31.     The Debtors' determination to move forward with the DIP Financing is an exercise of their business judgment following a thorough process conducted with the guidance of experienced advisors, and after careful evaluation of alternatives.  Given the Debtors' desires to wind down and not continue as a going-concern, the financing marketing process did not yield any actionable interest.  Indeed, it became clear that the DIP Financing was the best available financing source, and PBIH expressed a desire and willingness to move quickly to commit to provide financing on favorable economic terms.  DRF Logistics's advisors, with the oversight of an independent board of managers, negotiated the DIP Financing with PBIH in good faith and at arm's length, and the Debtors believe that they have obtained the best financing available in an amount sufficient to fund operations and the costs of the Chapter 11 Cases on reasonable terms. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as an exercise of the Debtors' business judgment.

**B.      Even if Entire Fairness Standard Applies, Entry into DIP Financing Should be Approved**

32.     Although business judgment is the proper standard for review and approval of the DIP Financing, the DIP Financing passes muster under the entire fairness standard as well. Following the Hilco Transaction (as defined in the Kaup Declaration), PBIH is not an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code.  Thus, the DIP Financing can and should be approved under the business judgement rule, especially given that DRF Logstics's board of managers, which is fully independent, oversaw the negotiation process and approved entry into the DIP Financing on behalf of the Debtors.

33.     The business judgment rule applies unless:  (i) the directors did not make a decision; (ii) the directors' decision was uninformed; (iii) the directors were not disinterested or independent; or (iv) the directors were grossly negligent.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  As set forth in the Lansio Declaration, the Debtors and their advisors went to great lengths to ensure independent board of managers (who are unaffiliated with Pitney Bowes) made an informed and reasonable decisions in their selection and negotiation of the proposed DIP Financing and, therefore, should be entitled to the deference of the business judgment rule.

34.     Even if the Court were to apply the "entire fairness" standard to analyze the DIP Financing, the DIP Financing should be approved.  The entire fairness standard consists of "two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985). Ordinarily, the party seeking to consummate the challenged transaction bears the burden of proving entire fairness.  *See Kahn v. Lynch Comm'ns Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994). The burden of pro[ving unfairness "shifts . . . entirely" to the challenging party, however, where the challenged transaction was approved by an independent committee of directors.  *Rosenblatt*, 493 A.2d at 937.  Where a controlling shareholder did not dictate the terms of the transaction and an independent negotiator had real bargaining power, which was exercised on an arm's-length basis, the burden to prove unfairness falls to the challenging party.  *Kahn*, 638 A.2d at 1117. Indeed, the business judgment rule is set aside only upon a showing that the debtor's directors were uninformed, grossly negligent, or lacking independence.  *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bank. D. Del. 2011); *In re Mid-State Raceway, Inc.*, 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) ("To overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent.").

35.     With respect to fair dealing, as set forth in the Lansio Declaration, PBIH and the Debtors were represented by separate advisors in negotiating the terms of the DIP Financing, and the independent managers on DRF Logistics's board oversaw the debtor-in-possession financing process and ultimately approved the DIP Financing.  Multiple iterations of a term sheet, budget, and draft definitive documents were traded and negotiated between the Debtors and DIP Lender.  The process, therefore, was at all times conducted in good faith and at arm's length.  Further, the terms of the DIP Financing are likewise fair, reasonable, and consistent with market comparables for similar financings.  As set forth in the Lansio Declaration, no third-party source of financing was available, which provides further support for the competitiveness of the terms.  Accordingly, the Debtors' entry into the DIP Financing satisfies the entire fairness standard to the extent such standard applies.

**C.      Debtors Should Be Authorized to Obtain DIP Financing on a Secured and Superpriority Basis**

36.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

37.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts will consider whether (i) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (ii) the credit transaction benefits the debtor as necessary to preserve estate assets, and (iii) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, No. 16-10429(SHL) 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.  Section 364, however, "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

38.     The DIP Financing satisfies all three prongs.  First, as stated above, the Debtors contacted seven third-party lenders, in addition to PBIH, to seek proposals for postpetition financing.  No parties except PBIH submitted proposals.  The Court should, therefore, authorize the Debtors to provide PBIH with superpriority administrative expense status for any DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code, in each case, in accordance with the DIP Note and Orders.

39.     Second, the DIP Financing is necessary to preserve the Debtors' estates. The Debtors require access to the DIP Financing to ensure they have sufficient liquidity to operate their businesses and administer their estates in the ordinary course during the wind-down and duration of the Chapter 11 Cases.  The Debtors' operating cash flow may not be sufficient to fund ongoing operations and expenses for the projected duration of the Chapter 11 Cases, including costs associated with the Chapter 11 Cases.  Without sufficient cash to fund the Chapter 11 Cases

and administrative costs (including ordinary course operating expenses), the Debtors risk diminishing value of their assets at a time when preservation of such value is critical.

40.     Third, the terms of the DIP Financing are fair, reasonable, and adequate under the circumstances.  As stated in the Lansio Declaration, Chiu Declaration, and this Motion, the DIP Financing represents the most favorable source of financing and is designed to provide the Debtors with sufficient liquidity for the duration of the Chapter 11 Cases through the wind-down period.

**D.     Debtors Should Be Authorized to Pay Interest and Other Amounts Required by DIP Documents**

41.     DIP Loans will accrue interest at 10% per annum monthly, which will be payable in kind.  In addition, in connection with the DIP Financing, the Debtors have agreed to pay the following amounts to the DIP Lender:

- *Upfront Fee*:  on the date of the Initial Draw, Borrower shall pay in cash to DIP Lender an upfront fee equal to 2.00% of the DIP Commitment, which shall be fully earned upon entry of the Interim Order and payable in kind; and

- *Undrawn Commitment Fee*:  on the last business day of each month, a fee equal to 1.00% of the unused DIP Commitment during the preceding month, shall accrue and payable in kind.

42.     Under the DIP Documents, the Debtors are also required to pay all fees, premiums and expenses under the DIP Financing on the Closing Date (as defined in the DIP Note), including the reasonable and documented out-of-pocket fees and expenses of counsel to the DIP Lender.

43.     As set forth in the Lansio Declaration, the Debtors submit that the interest rate, Upfront Fee, and the Undrawn Commitment Fee, and the other amounts payable to the DIP Lender in connection with the DIP Financing, in the aggregate, are fair and reasonable under the circumstances of the Chapter 11 Cases, particularly in light of the benefits received by the Debtors'

estates through the proposed DIP Financing.  Accordingly, the Debtors should be authorized to pay such amounts.

**E.     Debtors Should Be Permitted to Use Cash Collateral**

44.     For the reasons set forth herein, the Debtors require use of Cash Collateral for the continued operation of the Debtors' businesses during the wind-down period and smooth entry into the Chapter 11 Cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e)

45.     The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral.  Oaktree has consented to such use and waived any requirement for the Debtors to provide adequate protection.  Accordingly, the Court should grant the Debtors the authority to use Cash Collateral under section 363(c) of the Bankruptcy Code.

**F.     Carve-Out Is Appropriate**

46.     The DIP Financing subjects the DIP Lender's security interests, superpriority administrative expense claims, and the adequate protection claims and liens to the Carve-Out (as defined in the Interim Order).  Without the Carve-Out, the Debtors' estates or other parties in interest could be harmed because the services professionals might otherwise provide in

the Chapter 11 Cases could be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on Carve-Outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the pendency of the Chapter 11 Cases by ensuring that assets are available to pay U.S. Trustee fees and professional fees of the Debtors and any statutory committee.  Accordingly, the Debtors submit that the Carve-Out is reasonable and appropriate under the circumstances.

**G.      DIP Lender Should Be Deemed Good Faith Lender under Section 364(e)**

47.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

48.     As explained herein and in the Lansio Declaration, DIP Financing negotiations were conducted in good faith and at arm's length.  The proceeds of the DIP Loans will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and therefore entitled to all of the protections afforded by that section.

**H.      Modification of Automatic Stay Is Warranted**

49.      The relief requested herein contemplates a modification of the Automatic Stay (if applicable) to (i) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (ii) permit the DIP Lender to exercise rights and remedies under certain circumstances.   These provisions were part of the *quid pro quo* for the Debtors' ability to obtain the DIP Financing as provided in the DIP Note and in the Interim Order. Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five business days' notice to allow the Debtors to contest whether a default has occurred and is occurring.   Moreover, following the delivery of such notice, but prior to exercising certain remedies, the DIP Lender is required to file a motion seeking an emergency hearing for relief from the Automatic Stay (the "**Stay Relief Hearing**").   Until the Court adjudicates the DIP Lender's stay relief motion, the Debtors may use the proceeds of the DIP Financing (to the extent drawn prior to the occurrence of the Event of Default (as defined in the DIP Note)) in accordance with the DIP Note and Approved Budget.   Under these circumstances, the Debtors believe that the extent of the modifications to the Automatic Stay under the Interim Order are reasonable and should be approved.

50.      Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.   *See, e.g.*, In re Sheridan Holding Company *II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. October 21, 2019) (Docket No. 178) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. April 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No.

183) (same); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (Docket No. 64) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 21, 2012) (Docket No. 135) (same).

## I.      Debtors Require Immediate Access to DIP Financing

51.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See In re Ames Dep't Stores*, 115 B.R. at 36.

52.     The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.  The Debtors have an immediate need for access to the DIP Financing, to preserve the value Debtors' estates and provide assurances to employees, vendors, and other stakeholders that the Debtors have the financial wherewithal to continue operating during the pendency of the Chapter 11 Cases.  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid value-destruction that would lead to immediate and irreparable harm to the Debtors' estates.

## J.      Request for Final Hearing

53.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order.  The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

**Debtors Have Satisfied Bankruptcy Rule 6003(b)**

54.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first 21 days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the Lansio Declaration, the relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Debtors' Compliance with
Bankruptcy Rule 6004(a) and Waiver of Bankruptcy Rule 6004(h)**

55.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a), and waive the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

**Reservation of Rights**

56.     Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a

waiver of any claims or causes of action that may exist against any creditor or interest holder, or (vii) an approval, assumption, adoption, or rejection of any executory contract or unexpired lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve all of their rights with respect to the foregoing matters.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## Notice

57.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

## No Previous Request

58.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: August 9, 2024
        Houston, Texas

/s/ Gabriel A. Morgan
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
         Clifford.Carlson@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (*pro hac vice* pending)
Ronit J. Berkovich (*pro hac vice* pending)
Lauren Tauro (*pro hac vice* pending)
Alexander P. Cohen (24109739)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Ray.Schrock@weil.com
         Ronit.Berkovich@weil.com
         Lauren.Tauro@weil.com
         Alexander.Cohen@weil.com

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on August 9, 2024, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


*/s/  Gabriel A. Morgan*
Gabriel A. Morgan