United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 16, 2024

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **DRF LOGISTICS, LLC,** *et al.*, | § | **Case No. 24-90447 (CML)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | **Re:  Docket Nos. 33 & 57** |

### FINAL ORDER (I) AUTHORIZING
### DEBTORS TO (A) OBTAIN POSTPETITION
### FINANCING AND (B) USE CASH COLLATERAL,
### (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY
### ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING
### AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "**DIP Motion**")[2] of DRF Logistics, LLC and DRF, LLC, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to sections 105, 362, 363, 364(c), 364(e), 503, 506(c), and 507 of the **Bankruptcy Code**", Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1, and the Complex Case Procedures, seeking entry of the interim order entered at Docket No. 57 (the "**Interim Order**") and this final order (including all exhibits, schedules, and annexes hereto, this "**Final Order**"), as applicable, among other things:

(i)     authorizing DRF Logistics, LLC (in such capacity, the "**Borrower**") to obtain postpetition financing (the "**DIP Financing**") pursuant to a senior secured, superpriority debtor-in-possession multi-draw term promissory note, consisting of term loans in an aggregate principal amount of up to $47 million (the commitments in respect thereof, the "**DIP Commitments**" and such loans, the "**DIP Loans**") from the DIP Lender (as defined below) of which $45 million became available immediately upon entry of the Interim Order to be distributed in one or more draws (the "**Initial Draws**"),

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  DRF Logistics, LLC (6861) and DRF, LLC (7236).  The Debtors' mailing address is 7171 Southwest Parkway, Bldg. 300, Suite 400, Austin, TX 78735.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Motion, the DIP Note (as defined herein), or the Interim Order (as defined herein), as applicable.

with the remainder to be available subject to and upon entry of this Final Order, in each case subject to the terms and conditions set forth in that certain Debtor In Possession Secured Multi-Draw Term Promissory Note attached to the Interim Order as <u>Exhibit 1</u> (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**DIP Note**"), by and among the Borrower, DRF, LLC, as guarantor ("**Guarantor**" and together with the Borrower, "**Credit Parties**") and Pitney Bowes International Holdings, Inc. (the "**DIP Lender**")[3];

(ii)   authorizing the Credit Parties to execute, deliver and perform their obligations under the DIP Note and all other loan or security documentation related to the DIP Loans, including, as applicable, security agreements, pledge agreements, account control agreements, mortgages, deeds, and such other documents that may be necessary or reasonably required to implement the DIP Loans in accordance with the DIP Note and/or that may be reasonably requested by the DIP Lender in connection with the DIP Loans, in each case, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the DIP Note, the Interim Order, and this Final Order, the "**DIP Documents**");

(iii)   authorizing the Credit Parties to incur loans, advances, extensions of credit, financial accommodations, reimbursement obligations, interest, fees and premiums, costs, expenses and other liabilities, and all other obligations (including indemnities and similar obligations, whether contingent or absolute) due or payable under the DIP Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

(iv)   subject and subordinate to the Carve-Out (as defined below), granting to the DIP Lender allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations;

(v)   subject and subordinate to the Carve-Out, granting to the DIP Lender valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on all DIP Collateral (as defined below), including all Cash Collateral (as defined below), on the terms described herein, including the proceeds of any avoidance actions (*provided, however*, that the DIP Lender shall not have a lien on any causes of action against Pitney Bowes Inc. or any of its non-debtor affiliates, in each case, in any capacity, or the proceeds of such

---

[3] The "**DIP Lender**" is Pitney Bowes International Holdings, Inc. solely in its capacity as the DIP Lender under the DIP Note.

causes of action), which security interests and liens shall be subject to the priorities set forth herein;

(vi)    authorizing the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Final Order;

(vii)    waiving the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code;

(viii)    waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral for the benefit of any party other than the DIP Lender;

(ix)    authorizing the Debtors to use proceeds of the DIP Loans and Cash Collateral solely in accordance with this Final Order and the other DIP Documents, as applicable;

(x)    authorizing the Debtors to pay the principal, interest, fees, expenses, reimbursements, and other amounts payable under the DIP Documents as such become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

(xi)    vacating and modifying the automatic stay under section 362 of the Bankruptcy Code (the "**Automatic Stay**") to the extent necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of this Final Order and the other DIP Documents and to deliver any notices of default or termination described below and as further set forth herein; and

(xii)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order.

The Court having considered the relief requested in the DIP Motion, the exhibits attached thereto, the *Declaration of Lisa K. Lansio in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 35) (the "**Lansio Declaration**"), the *Declaration of Robin Chiu in Support of First-Day Motions and Applications* (Docket No. 42) (the "**Chiu Declaration**"), the available DIP Documents, and the evidence submitted and arguments

3

made at the interim hearing held on August 9, 2024 (the "**Interim Hearing**") and the final hearing held on the DIP Motion (the "**Final Hearing**"); and the Court having entered the Interim Order on August 9, 2024; and due and sufficient notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Interim Hearing and Final Hearing having been held and concluded; and all objections, if any, to the final relief requested in the DIP Motion having been withdrawn, resolved, or overruled by this Court; and it appearing that approval of the relief requested in the DIP Motion on a final basis is fair and reasonable and in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' property; and it appearing that the Credit Parties' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A. *Petition Date*. On August 8, 2024 (the "**Petition Date**"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**").  On August 9, 2024, this Court entered an order approving the joint administration of the chapter 11 cases.

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     *Debtors in Possession*. The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

C.     *Jurisdiction and Venue*. This Court has core jurisdiction over and authority with respect to these chapter 11 cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)–(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012. Consideration of the DIP Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court may enter a final order consistent with Article III of the United States Constitution. Venue for these chapter 11 cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. § 1408.  Sections 105, 362, 363, 364(c), 364(e), 503, 506(c), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 provide the bases for the relief sought in the DIP Motion and granted herein.

D.     *Committee Formation*. On August 26, 2024, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") appointed an official committee of unsecured creditors in these chapter 11 cases pursuant to section 1102 of the Bankruptcy Code (Docket No. 155) (the "**Creditors' Committee**" or "**Committee**").

E.     *Notice*. The Final Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, adequate, and sufficient notice of the DIP Motion and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, and no other or further notice is required to enter this Final Order.

F.      *Need for Postpetition Financing.*  The Debtors need the DIP Financing in order to, among other things, maintain, administer, and preserve certain limited operations and maximize the value of their estates, and to fund general corporate needs and expenses of the chapter 11 cases.  The access of the Debtors to sufficient working capital and liquidity through the incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary to, among other things, maximize the value of the property of the Debtors' estates and effectuate an orderly wind-down of the Debtors' business.

G.      *No Credit Available on More Favorable Terms.*  The Debtors are unable to obtain (i) financing on more favorable terms from sources other than the DIP Lender under the DIP Documents, (ii) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, (iii) credit for money borrowed with priority over any or all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, or (iv) secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting to the DIP Lenders the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below), in each case as provided for herein, subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in this Final Order and in the DIP Documents.  Accordingly, the DIP Financing is the best source of credit available to the Debtors and in the best interests of the Debtors and their estates.

H.      *Extension of Financing.*  The DIP Lender has indicated a willingness to provide the DIP Financing (and the DIP Loans thereunder) to the Borrower in accordance with the DIP Documents (including the Approved Budget (as defined below)) and subject to (a) the entry of the Interim Order and this Final Order, as applicable, (b) approval of the Milestones, and (c) findings by this Court that such financing is essential to the Debtors' estates, that the DIP

Lender has extended such credit in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens, rights, and other protections granted pursuant to and in connection with the Interim Order, this Final Order, and the DIP Financing (including the DIP Superpriority Claims and the DIP Liens), will not be affected by any subsequent reversal, modification, vacatur, or amendment of, as the case may be, the Interim Order, this Final Order, or any other order, as provided in section 364(e) of the Bankruptcy Code.

I.      *Business Judgment and Good Faith Pursuant to Section 364(e).*  Based on the DIP Motion, the Lansio Declaration, the Chiu Declaration, and the record presented to this Court at the Interim Hearing and the Final Hearing, the use of Cash Collateral and the terms of the DIP Financing, including the DIP Liens, are fair and reasonable, consistent with the Bankruptcy Code, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration, and have been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing or the DIP Documents, including all loans made to the Borrower pursuant to the DIP Documents and any other DIP Obligations shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Lender (and the successors and assigns thereof) shall be and is entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order, this Final Order, or any provision thereof and hereof, as applicable, is vacated, reversed or modified, on appeal or otherwise.

J.      *No Control*.  The DIP Lender (a) does not control the Debtors or their properties or operations or have authority to determine the manner in which any Debtors' operations are conducted and (b) is not a control person of the Debtors.

K.      *Corporate Authority*.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

L.      *Cash Collateral*.  As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code, and all collateral in which, pursuant to that certain Secured Senior Takeback Note, dated August 8, 2024 (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**Oaktree Takeback Note**") entered into between the Debtors and OPPS XI PTBW Holdings, L.P. and OPPS XII PTBW Holdings, L.P. ("**Oaktree**"), the Debtors have granted Oaktree a security interest.

Based upon the foregoing findings and conclusions, the DIP Motion and the record before this Court with respect to the DIP Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      *Motion Granted*. The relief sought in the DIP Motion is granted, the financing described herein is authorized and approved, and the use of Cash Collateral is authorized, in each case, on a final basis, subject to the terms and conditions set forth in the DIP Documents

and this Final Order.  All objections to this Final Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.     *DIP Obligations.*  The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized to enter into the DIP Documents and to incur and to perform the DIP Obligations in accordance with and subject to the terms and conditions of this Final Order and the other DIP Documents, and to deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Credit Parties under the DIP Documents and the creation and perfection of the DIP Liens described and provided for herein.  The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized to pay, in accordance with this Final Order, all principal, interest, fees, payments, expenses (whether arising pre- or post-petition), indemnities, and other amounts described herein and in the DIP Documents (including the DIP Obligations) as such amounts become due and without need to obtain further Court approval.  Upon execution and delivery of the DIP Documents, the DIP Documents constituted (and, as of the date of the entry of this Final Order, continue to constitute) legal, valid, binding, and non-avoidable obligations of the Credit Parties, enforceable against Credit Parties and their estates in accordance with the terms of the DIP Documents and this Final Order, and any successors thereto, including any trustee appointed in these chapter 11 cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these chapter 11 cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "**Successor Cases**"). Upon execution and delivery of the DIP Documents, the DIP Obligations included (and, as of the date of the entry of this Final Order, continue to include) all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Credit Parties to the DIP Lender, in such capacity, in each case, arising under the

DIP Documents (including this Final Order) and secured by the DIP Collateral, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts owed by the Credit Parties to the DIP Lender under the DIP Documents (including this Final Order); *provided, however*, that except as otherwise set forth in this paragraph 2, the DIP Obligations shall not include any prepetition claims that the DIP Lender may have against any Debtor other than in its capacity as DIP Lender.  The Credit Parties shall be jointly and severally liable for the DIP Obligations.  Except as permitted hereby, no obligation, payment, transfer, or grant of security hereunder or under the DIP Documents to the DIP Lender (including its Representatives (as defined below)) arising under the DIP Documents shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

3. *Authorization to Borrow.*  The Borrower was authorized by the Interim Order to borrow up to an aggregate amount of the Initial Draws, in each case for the purposes described in the Interim Order, and is hereby authorized to make additional draws up to the aggregate principal amount of the DIP Commitments in accordance with the DIP Documents (including this Final Order); *provided, however*, that the use of the proceeds of the DIP Loans (including the Initial Draws) shall be subject to and in accordance with the terms and conditions

of this Final Order and the other DIP Documents, including the Approved Budget (subject to any Permitted Variances).

4.      *Authorization to Use Cash Collateral.*  The Credit Parties have a need to use Cash Collateral in connection with the orderly wind-down of their business and were, by the Interim Order, and hereby are, on a final basis, authorized to use the Cash Collateral in accordance with this Final Order.  For the avoidance of doubt, Oaktree has consented to the Debtors' use of Cash Collateral and is waiving any request for adequate protection to which it may be entitled under the Bankruptcy Code.

5.      *No Obligation to Extend Credit.*  The DIP Lender shall have no obligation to make any loan or extension of credit under the DIP Documents (and the Debtors shall not make any request therefor) unless all conditions precedent to the making of such loan or extension of credit under the DIP Documents, the Interim Order, or this Final Order, as applicable, have been satisfied or waived in accordance with the terms of the DIP Documents.

6.      *Amendment of the DIP Documents.*  The DIP Documents (other than this Final Order) may be amended, restated, amended and restated, modified, or supplemented from time to time by the Credit Parties and the DIP Lenders (acting in accordance with the terms of the DIP Note) without further order of this Court; *provided, however,* that any amendment, modification, waiver, or supplement to the DIP Documents that (i) shortens the maturity date under the DIP Note, (ii) increases the aggregate commitments thereunder, (iii) increases the interest rate or fees payable thereunder, or (iv) releases any DIP Liens (each, a "**Material DIP Amendment**"), shall be provided to the U.S. Trustee, the Creditors' Committee, and any other statutory committee (if any) and filed with this Court no later than five (5) business days (to the extent reasonably practicable) prior to the anticipated date of effectiveness of any such Material DIP Amendment.

If no written objection to the Material DIP Amendment is made by the U.S. Trustee or the Creditors' Committee within such five-business-day period, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective. If a written objection is made by the U.S. Trustee or the Creditors' Committee within such five-business-day period, then such Material DIP Amendment shall be subject to a hearing and approval of this Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from this Court of any Material DIP Amendment on an expedited basis.  For the avoidance of doubt, and unless otherwise provided in this Final Order, updates, modifications, and supplements to the Approved Budget and the extension of any Milestone by agreement of the DIP Lender shall not constitute a Material DIP Amendment or require further approval of this Court.

7.      *DIP Liens*.  Effective as of the Petition Date, in each case subject and subordinate only to the Carve-Out and the Permitted Liens (as defined below), if any, to secure the DIP Obligations, the DIP Lender was, by the Interim Order, and hereby is, on a final basis, granted, without the necessity of the execution, recordation or filing by the Borrower of any mortgages, security agreements, account control agreements, pledge agreements, financing statements, intellectual property filing or other similar documents, any notation of certificates of title for titled goods or other similar documents, instruments, deeds, charges or certificates, or the possession or control by the DIP Lender of, or over, any collateral, the following security interests and liens (all such security interests and liens granted to the DIP Lender pursuant to this Final Order and the other DIP Documents, the "**DIP Liens**" and the property subject to the DIP Liens, the "**DIP Collateral**"):

>    (a) *Section 364(c)(2) DIP Liens.*  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, and automatically and fully-perfected first priority senior security interest (subject and subordinate only to the Carve-Out) in, and lien upon, all

tangible and intangible prepetition and postpetition property of each of the Credit Parties and their estates, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including any unencumbered cash of the Debtors and any investment of such cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, investment property, letter-of-credit rights, supporting obligations, vehicles, plants, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of Debtor DRF, LLC and a portion of the issued and outstanding capital stock of non-Debtor Pitney Bowes Global Ecommerce (APAC) Co. Ltd. (as set forth in the DIP Documents), beneficial interests in any trust, money, goodwill, causes of action, including the proceeds of Avoidance Actions[5] (*provided, however*, that the DIP Lender shall not have a lien on any causes of action against Pitney Bowes Inc. or any of its non-debtor affiliates, in each case, in any capacity, or the proceeds of such causes of action) and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired or arising and wherever located; *provided, further,* that the DIP Lender shall use commercially reasonable efforts to first obtain recoveries from DIP Collateral other than the proceeds of Avoidance Actions.

(b) *Section 364(c)(3) DIP Liens.* Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of each of the Credit Parties, whether existing on the Petition Date or thereafter acquired, and all cash and non-cash proceeds, rents, products, substitutes, accruals and profits of such property that is subject and subordinate only to (i) the Carve Out and (ii) liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code) other than the liens granted pursuant to the Oaktree Takeback Note (collectively, the "**Permitted Liens**"), which security interests and liens in favor of the DIP

---

[5] "**Avoidance Actions**" are all claims and causes of action arising under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable state law.

Lender shall be immediately junior and subordinate to any such Permitted Liens.

(c) *Excluded Property*.   Notwithstanding the foregoing, the liens granted pursuant to this Final Order shall not attach to any Excluded Property (which shall include any causes of action against Pitney Bowes Inc. or any of its non-debtor affiliates, in each case, in any capacity, or the proceeds of such causes of action) and no Excluded Property shall constitute DIP Collateral.

8.     *DIP Superpriority Claims*.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Credit Parties on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against any of the Credit Parties, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 362, 363, 364, 365, 503, 506, 507, 546, 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, which allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**") of the DIP Lender shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of any of the Credit Parties and their estates and all products and proceeds thereof, other than any causes of action against Pitney Bowes Inc. or any of its non-debtor affiliates, in each case, in any capacity, or the proceeds of such causes of action, in accordance with the DIP Documents and this Final Order.  The DIP Superpriority Claims shall be subject and subordinate only to the Carve-Out.  The DIP Superpriority Claims shall be entitled to

14

the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or this Final Order or any provision thereof and hereof, as applicable, is vacated, reversed or modified, on appeal or otherwise.

9. *Priority of DIP Liens and DIP Superpriority Claims*. Other than as set forth herein or permitted under the DIP Documents, the DIP Liens and the DIP Superpriority Claims (a) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code, (b) shall not be subject or subordinate to or made *pari passu* with (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (ii) any intercompany or affiliate liens of any of the Credit Parties or security interests of any of the Credit Parties, or (iii) unless otherwise provided for in the DIP Documents or in this Final Order, any liens or security interests arising after the Petition Date, including any other liens or security interests under section 363 or 364 of the Bankruptcy Code, and (c) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in these chapter 11 cases or a Successor Case, and/or upon the dismissal of any of these chapter 11 cases.

10. *Perfection of DIP Liens.*

(a) This Final Order shall be sufficient and conclusive evidence of the validity, attachment, enforceability, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document that may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the DIP Liens, or to entitle the DIP Liens to the priority granted herein and the other DIP Documents.

(b)       Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, deeds of trust, mortgages, security agreements, notices of liens and other similar documents, and is hereby granted relief from the Automatic Stay in order to do so, and all such financing such financing statements, deeds of trust, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Petition Date.  Subject in all instances to the terms of the DIP Documents, the Credit Parties shall execute and deliver to the DIP Lender all such financing statements, deeds of trust, mortgages, security agreements, notices and other documents or instruments, and otherwise cooperate and assist in any such filings, as the DIP Lender may reasonably request to further evidence, confirm, validate or perfect, or to ensure the contemplated priority of, the DIP Liens.  The DIP Lender, in its sole discretion, may file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Credit Party has real or personal property and, in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order.

(c)       Any provision of any lease, contract, or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold or contractual interest, or the proceeds thereof, or other postpetition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code and shall have no force and effect with respect to the grant of postpetition liens in such leasehold or contractual interest or the proceeds of any assignment and/or

sale thereof by the Debtors, in favor of the DIP Lender in accordance with the terms of this Final Order or the other DIP Documents.

11.    *Budget.*   The Credit Parties may use the proceeds of the DIP Loans in accordance with the Approved Budget (subject to any Permitted Variances), the DIP Documents, and this Final Order.  The budget attached to the DIP Note as <u>Schedule 1</u> constituted the initial budget (the "**Initial DIP Budget**") that reflects, among other things, the Debtors' anticipated operating receipts, anticipated operating disbursements, anticipated non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby.  Commencing on September 5, 2024, and every fourth Thursday thereafter, the Borrower shall submit a revised proposed budget to the DIP Lender for approval solely in accordance with the DIP Note (each a "**Subsequent DIP Budget**"), with a copy delivered contemporaneously to the Creditors' Committee.  Upon the expiration of a five business-day period after submission to the DIP Lender, once approved by the DIP Lender in writing in accordance with the DIP Note, and so long as there is no objection filed by the Creditors' Committee with this Court that remains pending (the Initial DIP Budget and each approved Subsequent DIP Budget shall constitute, without duplication, an "**Approved Budget**"), a Subsequent DIP Budget shall modify, replace, supplement, or supersede, as applicable, the then-applicable Approved Budget for the periods covered thereby.

12.    *Carve-Out.*

(a)    *Priority of Carve-Out*.  Each of the DIP Liens, the DIP Superiority Claims, and any other liens, claims, or interests that the DIP Lender or any its Affiliates[6] hold, own or control in relation to the Debtors or their Affiliates, shall be subject and subordinate only

---

[6] "**Affiliate(s)**" shall, with respect to an Entity (as defined in section 101(15) of the Bankruptcy Code), have the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

to payment of the Carve-Out.  The Carve-Out shall be senior to all claims and liens, including DIP Superpriority Claims and DIP Liens, over any assets of the Debtors, including any DIP Collateral, as set forth in this Final Order.

(b)      *Carve-Out*.  As used in this Final Order, the "**Carve-Out**" means the sum of (i) all unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all unpaid reasonable and documented fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise, all accrued but unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained or proposed to be retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") and the Creditors' Committee or other statutory committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (collectively, the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**"), at any time before or on the first business day following the delivery of the Carve-Out Trigger Notice (as defined below) and without regard to whether such fees or expenses are provided for in any Approved Budget or were invoiced after the Carve-Out Trigger Date (as defined below) and any unpaid portion of a transaction fee of up to $250,000 payable to Triple P Securities, LLC and Triple P RTS, LLC the Debtors' restructuring advisor, in respect of consummation of the DIP Loans (but no other transaction type fees will be included in the Carve-Out), whether allowed by this Court prior to or after delivery of a Carve-Out Trigger Notice (the amounts set forth in this clause (iii) being the "**Pre-Carve-Out Trigger Notice Cap**"),

(iv) Allowed Professional Fees of Debtor Professionals incurred after the first business day following the Carve-Out Trigger Date in an aggregate amount not to exceed $2,150,000 (the amount set forth in this clause (iv) being the "**Debtor Post-Carve-Out Trigger Notice Cap**"), and (v) Allowed Professional Fees of the Creditors' Committee or other statutory committee (if any) incurred after the first business day following the Carve-Out Trigger Date in an aggregate amount not to exceed $600,000 (the amount set forth in this clause (v), together with the Debtor Post-Carve-Out Trigger Notice Cap, the "**Post-Carve-Out Trigger Notice Cap**", and, such Post-Carve-Out Trigger Notice Cap together with the Pre-Carve-Out Trigger Notice Cap, the "**Carve-Out Cap**"); *provided* that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in this paragraph 12(b). For purposes of this Final Order, the "**Carve-Out Trigger Notice**" shall mean a written notice (which may be via electronic mail) delivered by the DIP Lender to Weil, Gotshal & Manges LLP ("**Weil**"), as proposed counsel to the Debtors, the U.S. Trustee, and Lowenstein Sandler LLP and McDermott Will & Emery LLP, as proposed counsel to the Creditors' Committee, or other statutory committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (a "**DIP Note Event of Default**") and acceleration of the DIP Obligations, stating that the Carve-Out has been invoked.  The Post-Carve-Out Trigger Notice Cap shall not be reduced or increased by the amount of any compensation or reimbursement of expenses paid prior to the occurrence of a DIP Note Event of Default in respect of which the Carve-Out is invoked.

(c) *Professional Fee Account.*  As soon as reasonably practicable following entry of the Interim Order, the Debtors transferred cash, including proceeds from DIP Loans, in an amount equal to the total budgeted (or actual, if available) weekly fees and expenses

incurred or to be incurred by Professional Persons (such fees and expenses of Professional Persons, the "**Professional Fees**") between the Petition Date and the first weekly period set forth in the Approved Budget into a segregated account not subject to control, liens, security interests, or claims of the DIP Lender (the "**Professional Fee Account**").   Thereafter, on a weekly basis, the Debtors shall transfer into the Professional Fee Account cash, including DIP Loan proceeds, in an amount equal to the aggregate unpaid amount of Weekly Estimated Fees and Expenses (as defined below) included in all Weekly Statements (as defined below) received by the Debtors.   The Professional Fee Account shall not be subject to the control of the DIP Lender, and the funds transferred to the Professional Fee Account shall not be subject to the DIP Liens, constitute DIP Collateral, nor be available to pay the DIP Lender Superpriority Claim until all amounts set forth in paragraph 12, including all Professional Fees, are paid in full.

(d)    *Pre-Carve-Out Trigger Notice*.   Prior to the delivery of a Carve-Out Trigger Notice, on the third business day of each week starting with the first full calendar week following the date of the Interim Order, each Professional Person shall deliver to the Debtors, the DIP Lender, and their respective advisors a weekly statement (each, a "**Weekly Statement**") setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the preceding week ("**Weekly Estimated Fees and Expenses**"), and the Debtors shall, on a weekly basis, transfer cash proceeds from DIP Loans or cash on hand into the Professional Fee Account in an amount equal to the aggregate amount of Weekly Estimated Fees and Expenses based on the Weekly Statements submitted by each Professional Person (and if no such estimate is provided in a given week, then the amount forecasted for such Professional Person in the Approved Budget) that remain unpaid (and that were not previously funded to the Professional Fee Account).   The Debtors shall use funds held in the

20

Professional Fee Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, in accordance with any orders of the Court; *provided* that the Debtors' or their estates' obligations to pay Allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fee Account.

(e)     *Post-Carve-Out Trigger Notice.*  On the date on which a Carve-Out Trigger Notice is delivered in accordance with this paragraph 12 of this Final Order ("**Carve-Out Trigger Date**"), the Carve-Out Trigger Notice shall (i) constitute a demand to the Borrower to utilize all cash (including cash on hand and any available cash thereafter held by any Debtor) to fund into the Professional Fee Account an amount equal to (A) the Pre-Carve Out Trigger Notice Cap and (B) the Post-Carve-Out Trigger Notice Cap ((A) and (B), each to the extent not previously funded to the Professional Fee Account, including after giving effect to the last sentence of this paragraph), and (ii) notwithstanding anything in the DIP Documents to the contrary, including with respect to the existence of any default or DIP Note Event of Default or any termination of the DIP Commitments thereunder following a DIP Note Event of Default, be deemed a draw request and notice of borrowing under the DIP Note in an amount equal to the lesser of (A) the Carve-Out Cap, and (B) the amount of the undrawn commitments under the DIP Note, in each case, only to the extent in excess of the amounts funded pursuant to clause (i) of this sentence.  Following the delivery of a Carve-Out Trigger Notice, each Professional Person shall promptly deliver one (1) additional statement to the Debtors, the DIP Lender, and their respective advisors setting forth a good-faith estimate of the amount of accrued but unpaid fees and expenses incurred by such Professional Person during the period following the period covered by the most recent Weekly

Statement previously delivered by such Professional Person through and including the Carve-Out Trigger Date, and the Debtors shall transfer such amounts to the Professional Fee Account.

(f)      Subject to paragraph 12(e), (i) an amount equal to the Post-Carve-Out Trigger Notice Cap shall promptly be funded into the Professional Fee Account on the Carve-Out Trigger Date and (ii) after delivery of a required Carve-Out Trigger Notice, if the Professional Fee Account has not been funded with the full amount of the Pre-Carve-Out Trigger Notice Cap, such amount shall promptly be funded within two business days of delivery of such Carve-Out Trigger Notice as set forth herein.  In no event shall the DIP Lender sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fee Account has been fully funded in the amount set forth in paragraph 12(e). If, after paying all amounts set forth in this paragraph 12, the Professional Fee Account has not been reduced to zero, all remaining funds in the Professional Fee Account shall be distributed to the Debtors or their estates and be subject to the DIP Collateral and DIP Liens of the DIP Lender.

(g)      Notwithstanding anything to the contrary in this Final Order or the DIP Documents, (i) disbursements by the Debtors from the Professional Fee Account shall not constitute loans or indebtedness under the DIP Documents or otherwise increase or reduce the DIP Obligations, (ii) the failure of the Professional Fee Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, (iii) nothing contained herein shall constitute a cap or limitation on the amount that the Professional Persons may assert as administrative-expense claims against the Debtors or their estates on account of Allowed Professional Fees incurred by such Professional Persons, and (iv) the Carve-Out and the entitlement of the Professional Persons to the Professional Fee Account proceeds shall be senior to all liens and claims, including those securing the DIP Obligations.  For the avoidance of doubt,

22

nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement, or compensation described in this paragraph 12.

(h)     *Payment of Carve-Out on or After the Carve-Out Trigger Date.*  Any payment or reimbursement made after the occurrence of the Carve-Out Trigger Date in respect of any Allowed Professional Fees incurred after the occurrence of the Carve-Out Trigger Date shall permanently reduce the Carve-Out Cap on a dollar-for-dollar basis

(i)     *No Direct Obligation to Pay Allowed Professional Fees*.  The DIP Lender shall not be responsible for the payment or reimbursement of any fees or expenses of any Professional Person incurred in connection with these chapter 11 cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Final Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; *provided*, *however*, that nothing herein shall limit the DIP Lender's obligations to honor its obligations under the DIP Note and this Final Order to provide funding to the Debtors and to fund any shortfall as contemplated in paragraph 12(c), (d), (e), and (f) above to the extent of any undrawn DIP Commitments.

(j)     *Security Interests in Residual Carve-Out Funds*.  The DIP Lender shall have a security interest in any residual cash balance remaining in the Professional Fee Account after all Allowed Professional Fees have been paid in full pursuant to an order of this Court.

13.     *Events of Default; Rights and Remedies Upon Event of Default.*

(a)     Upon the occurrence and during the continuation of a DIP Note Event of Default that has not been waived by the DIP Lender or otherwise cured in accordance

with the DIP Documents (an "**Event of Default Occurrence**"), and following delivery of a written notice (a "**Default Notice**") on not less than five business days' notice (such five business day period, the "**Remedies Notice Period**") by the DIP Lender to counsel to the Debtors, counsel to the Creditors' Committee or other statutory committee (if any), and the U.S. Trustee (the "**Remedies Notice Parties**"), the DIP Lender may (and the Automatic Stay is hereby modified, except as otherwise set forth herein) without further notice to, hearing of, or order from this Court, unless this Court orders otherwise (*provided,* that during the Remedies Notice Period, the Debtors, the Creditors' Committee or other statutory committee (if any), and/or any party in interest shall be entitled to seek an emergency hearing before the Court, and must provide prompt notice of such hearing to counsel to the DIP Lender, to contest whether an Event of Default Occurrence has occurred and/or to seek authority for the non-consensual use of Cash Collateral, and *provided, further*, that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period shall be continued until the Court hears and rules with respect thereto): (i) terminate any and all obligations of the DIP Lender in connection with the DIP Loans (including to make any further DIP Loans (except with respect to the funding of the Carve-Out in accordance with this Final Order)) and the authority for the use of Cash Collateral under this Final Order and the other DIP Documents, as applicable; (ii) declare the DIP Obligations (subject only to the Carve-Out) immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Borrower; (iii) terminate or reduce the DIP Commitments to the extent any such commitments remain outstanding; (iv) terminate the DIP Note and the DIP Loans thereunder with respect to any future liability or obligation of the DIP Lender, but, for the avoidance of doubt, without affecting any of the DIP Liens, the DIP Superpriority Claims, or the

DIP Obligations and any rights of the DIP Lender provided by this Final Order; (v) invoke the right to charge interest at the default rate under the DIP Documents; and (vi) deliver the Carve-Out Trigger Notice.  Upon delivery of a Default Notice by the DIP Lender and during the Remedies Notice Period, without further notice or order of this Court, the Borrower's ability to borrow under the DIP Note and incur additional DIP Obligations shall be suspended and the DIP Lender shall have no obligation to provide any DIP Loans or other financial accommodation, except in respect of borrowing under the DIP Note to fund the Carve-Out in accordance with paragraph 12(e) hereof. Notwithstanding delivery of a Default Notice, the Debtors may use the proceeds of the DIP Loans (only to the extent already drawn prior to the occurrence of a DIP Note Event of Default that is continuing or for the funding of the Carve-Out in accordance with this Final Order), and other DIP Collateral in accordance with the terms of this Final Order (including in respect of borrowing under the DIP Note to fund the Carve-Out in accordance with this Final Order) and the Approved Budget (including any Permitted Variance).

(b)     Upon an Event of Default Occurrence, the DIP Lender, prior to exercising any rights or remedies with respect to the DIP Collateral, shall be required to file a motion with the Court seeking emergency relief and an emergency hearing before the Court (a "**Stay Relief Hearing**") on at least five business days' written notice to the Remedies Notice Parties, and the Debtors agree not to object to the shortening of notice of such Stay Relief Hearing. At such Stay Relief Hearing, the DIP Lender may seek Court approval to enforce any other rights or remedies (in addition to those set forth in paragraph 13(a) above) with respect to the DIP Collateral and the DIP Liens, including (i) the enforcement of DIP Liens, including foreclosure on all or any portion of the DIP Collateral, occupying the Debtors' premises, or sale or disposition of all or any part of the DIP Collateral, or (ii) any other remedies permitted under this Final Order,

the DIP Documents, or applicable law. If the DIP Lender is permitted by the Court to take any enforcement action with respect to the DIP Collateral following the Stay Relief Hearing, the Debtors shall cooperate with the DIP Lender in its effort to enforce its security interest in and liens on the DIP Collateral, and shall not take or direct any person or entity to take any action designed or intended to hinder or restrict in any respect the DIP Lender from enforcing its security interests in and liens on the DIP Collateral. For the avoidance of doubt, prior to the entry by this Court of an order granting stay relief to the DIP Lender, the Debtors may use the proceeds of the DIP Loans (to the extent already drawn prior to the occurrence of a DIP Note Event of Default that is continuing) or Cash Collateral in accordance with the Approved Budget (including Permitted Variances) and the terms of the DIP Documents and this Final Order, as applicable.

(c)     Notwithstanding the occurrence of a DIP Note Event of Default and/or termination of the DIP Commitments, all the rights, remedies, benefits, and protections provided to the DIP Lender under the DIP Documents and this Final Order shall survive. For the avoidance of doubt, irrespective of any Remedies Notice Period, the DIP Lender shall not be obligated to provide any DIP Loans or advances at any time upon the occurrence and continuation of a DIP Note Event of Default.

14.     *Credit Bidding*. Subject to the lien priorities set forth herein, the DIP Lender shall have the right to credit bid pursuant to section 363(k) of the Bankruptcy Code, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral outside the ordinary course of business, without the need for further Court order authorizing the same and whether any such sale is effectuated through sections 363(k), 1123 or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise, in each case unless the Court for cause orders otherwise; *provided, however,* that the

DIP Lender must provide five business days' notice to the Debtors and to the Creditors' Committee of its intent to submit a credit bid.

15.     *Maintenance of DIP Collateral*.   Upon entry of the Interim Order, and as ratified by this Final Order, to the fullest extent provided by applicable law, the DIP Lender is, and is deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral, and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies.

16.     *Disposition of DIP Collateral*.   The Credit Parties shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents or an order of this Court.

17.     *Good Faith Under Section 364(e) of the Bankruptcy Code.*   Based on the findings set forth in the Interim Order and this Final Order and in accordance with section 364(e) of the Bankruptcy Code (and solely to the maximum extent set forth in section 364(e) of the Bankruptcy Code), in the event any or all of the provisions of the Interim Order or this Final Order are hereafter reversed or modified on appeal, the DIP Lender is entitled to the full protections provided in section 364(e) of the Bankruptcy Code.

18.     *Payment of Fees and Expenses*.   The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized to and shall pay, without further Court order, the fees and expenses of the DIP Lender required by the DIP Note, including the fees and expenses of attorneys or advisors retained by the DIP Lender in accordance with the DIP Note.   Subject to the review procedures set forth in this paragraph 18, payment of such fees and expenses shall not be subject to allowance or review by this Court or subject to the U.S. Trustee guidelines; *provided,*

*however,* that any time that such professionals seek payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, each applicable professional shall provide summary copies of its invoices including aggregate amounts of fees and expenses and total amount of time on a per-professional basis (which shall not be required to contain time detail and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) to the Debtors, counsel to the Creditors' Committee or other statutory committee (if any), and the U.S. Trustee (together, the "**Review Parties**"); *provided, however,* that the U.S. Trustee and counsel to the Creditors' Committee reserve their right to request additional details regarding the services rendered and expenses incurred by such professionals (an "**Information Request**").   Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten calendar days after the receipt by the Review Parties (the "**Review Period**"), which shall not be extended by the delivery of an Information Request or the timing of any reply thereto.  If no written objection is received by 12:00 p.m., prevailing Eastern Time, on the end date of the Review Period, the Debtors shall pay such invoices within five business days after the end of the Review Period.  If an objection to a professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice without the necessity of filing formal fee applications, regardless of whether such amounts arose or were incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the

parties are unable to resolve the dispute consensually.  No attorney or advisor to the DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Lender in connection with or with respect to the DIP Financing are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement or any similar form of recovery by the Debtors or any other person.

19.     *Proofs of Claim*.  The DIP Lender shall not be required to file proofs of claim in these chapter 11 cases or any Successor Cases with respect to their DIP Obligations under the DIP Documents, and the evidence presented with the DIP Motion and the record established at the Interim Hearing and the Final Hearing are deemed sufficient to, and do, constitute proofs of claim with respect to the DIP Obligations, secured status, and priority. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in these chapter 11 cases or any Successor Cases to the contrary, the DIP Lender is authorized, but not directed or required, to file a proof of claim in any of these chapter 11 cases or any Successor Cases for any claim allowed herein.  Any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all the Debtors, rather than as separate proofs of claim against each Debtor.

20.     *No Third-Party Rights*.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

21.     *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve-Out, no costs or expenses of administration of these chapter 11 cases or any Successor Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP

Collateral (including Cash Collateral) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, and nothing contained in this Final Order shall be deemed to be a consent by the DIP Lender to any charge, lien, assessment, or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

22. *No Marshaling*.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations.

23. *Limitation of Liability*.  In determining to make any loan or other extension of credit under the DIP Documents, to permit the use of the DIP Collateral (including Cash Collateral), or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Lender shall not (a) have any liability to any third party or be deemed to be in "control" of the Debtors or operations of the Debtors, (b) owe any fiduciary duty to the Debtors, their respective creditors, or estates, or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code). Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective Affiliates in the operation of their businesses or in connection with their winddown efforts.

24.     *Indemnification*.  The DIP Lender has acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by it in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the DIP Financing and the use of Cash Collateral, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Financing, the DIP Documents, and all other documents related to and all transactions contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the DIP Lender shall be and hereby is indemnified (as applicable) to the extent, and subject to any limitations, provided in the DIP Documents, including Section 9 of the DIP Note.  The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Final Order to any obligation set forth, as the case may be, in this paragraph 24 or in the DIP Documents, to indemnify and/or hold harmless the DIP Lender and any such defenses are hereby waived.

25.     *No Third-Party Releases or Limitations Periods.*  Notwithstanding anything to the contrary in the Interim Order or this Final Order, neither the Interim Order nor this Final Order (i) release any third parties or parties in interest other than the DIP Lender in its capacity as such, or (ii) impose any limitation periods on any claim or cause of action against any party.

26.     *Final Order Governs*.  In the event of any inconsistency between the provisions of this Final Order, the Interim Order, or the DIP Documents, the provisions of this Final Order shall govern. Notwithstanding anything to the contrary in any other order entered by this Court, (a) all payments and actions by any of the Debtors made pursuant to any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Final Order and the other DIP Documents, including the Approved Budget (subject to Permitted Variances) and all other terms and conditions hereof and (b) to the

extent there is any inconsistency between the terms of such other order and this Final Order, this Final Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

27.     *Binding Effect; Successors and Assigns*.   The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these chapter 11 cases, including the DIP Lender, the Creditors' Committee or any other statutory or non-statutory committees appointed or formed in these chapter 11 cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lender and the Debtors and their respective successors and assigns; *provided, however,* that the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

28.     *Effectiveness*.   This Final Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062, or 9014 of the Bankruptcy Rules or any Bankruptcy Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

29.     *Payments Held in Trust*.  Except as expressly permitted in this Final Order or the DIP Documents and except with respect to the Debtors, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations and termination of all DIP Commitments, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lender and shall immediately turn over the proceeds to the DIP Lender, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order.

30.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Lender pursuant to the provisions of this Final Order, the DIP Documents, or any subsequent order of the Court shall be irrevocable, received free and clear of any claim, charge, assessment or other liability, including any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code, whether asserted or assessed by, through, or on behalf of the Debtors or their estates.

31.     *Bankruptcy Rules*.  The requirements of Bankruptcy Rules 4001 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

32.     *Necessary Action*.  The Debtors and the DIP Lender are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Final Order. In addition, the Automatic Stay is modified to permit Affiliates of the Debtors who are not debtors in the chapter 11 cases to take all reasonable actions as are necessary or appropriate to implement the terms of this Final Order.

33.     *Headings*.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

34.     *Retention of Jurisdiction*.  The Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

35.     *Reporting to Committee*.  The Debtors shall deliver to the Committee each of the reports and other items set forth on Annex A of the DIP Note simultaneously with delivery of such reports and other items to the DIP Lender to the extent reasonably practicable.  The Debtors shall deliver to the Committee one business days' notice of any mandatory prepayments required pursuant to section 7(b) of the DIP Note simultaneously with delivery of such notice to the DIP Lender.

36.     *Chubb Reservation of Rights*.  For the avoidance of doubt, (i) the DIP Documents do not grant to any other party any liens or security interests in any property (or the proceeds thereof) held by ACE American Insurance Company or any of its U.S.-based affiliates (collectively, together with each of their successors, and solely in their roles as insurers, "**Chubb**") as collateral to secure obligations under any insurance policies or related agreements issued or entered into by Chubb (the "**Chubb Collateral**") with respect to policies issued by Chubb providing coverage for the Debtors, (ii) the proceeds of any insurance policy issued by Chubb shall only be considered to be DIP Collateral to the extent such proceeds are paid to the Debtors (as opposed to a third party claimant) pursuant to the terms of any such applicable insurance policy, and (iii) the DIP Documents do not alter or modify the terms and conditions of any insurance

policies issued by Chubb to or providing coverage to the Debtors, Pitney Bowes, Inc. or any of its affiliates, or any agreements related thereto.

37.    The Debtors shall promptly serve copies of this Final Order to the parties having been given notice of the Final Hearing and to any party that has filed a request for notices with this Court in these chapter 11 cases.

Signed: September 16, 2024

Christopher Lopez
United States Bankruptcy Judge